**United States Court of Appeals**
**For the Eighth Circuit**

No. 03-3082

|  |  |  |
|---|---|---|
|  | * |  |
| Minneapolis-St. Paul Mailers Union, | * | Appeal from the United |
| Local #4, | * | States District Court |
|  | * | for the District of |
| Plaintiff - Appellant, | * | Minnesota |
|  | * |  |
| v. | * |  |
|  | * |  |
| Northwest Publications, Inc., doing | * |  |
| business as St. Paul Pioneer Press, | * |  |
|  | * |  |
| Defendant - Appellee. | * |  |
|  | * |  |

Submitted: May 13, 2004
Filed: August 13, 2004

Before WOLLMAN, BYE, and HAMILTON[1], Circuit Judges.

HAMILTON, Circuit Judge:

[1]The Honorable Clyde H. Hamilton, United States Circuit Judge for the United States Court of Appeals for the Fourth Circuit, sitting by designation.

The Minneapolis-St. Paul Mailers Union, Local #4 (the Union) appeals the district court's[2] order confirming in full an arbitration award in favor of Northwest Publications, Inc., d/b/a St. Paul Pioneer Press (the Company). For reasons that follow, we affirm.

## I.

The Company publishes a daily newspaper entitled the "St. Paul Pioneer Press" and employs members of the Union to perform various tasks in order to prepare the newspapers for public sale and distribution. At issue in the present dispute between the Union and the Company is work known as "insertion" or "inserting," which is the placing of sections of the paper and advertising flyers into other parts of the paper to create a single package. At all times relevant to this case, the working relationship between the Union and the Company was governed by a collective bargaining agreement (the CBA) covering the period November 1, 1999 through October 31, 2004.

Several provisions of the CBA are particularly relevant to the issues on appeal. The first is Section 6 of the CBA, which initially sets forth the Union's jurisdiction as follows:

> The jurisdiction of the Union is defined as including all mailing room work of the Publisher and includes all work appertaining to mailing, such as addressing, tagging, jogging, stamping, labeling, bundling or wrapping, preparing list or wrappers . . . stacking, folding, handling of bundles or mail sacks, distributing, counting of papers (leaving or returning), banding, strapping, tying, sacking, delivering papers to chutes, <u>inserting or dispatching of papers, envelopes or magazines, whether done by hand or power machine</u> . . . and the Publisher shall make no other contract covering such work except as otherwise provided in this agreement. . . .

---

[2]The Honorable Ann D. Montgomery, United States District Judge for the United States District Court for the District of Minnesota.

All work within the jurisdiction of the Union shall be performed only by journeymen, journeymen II, trainees and extras, except as otherwise provided in this agreement.

Notwithstanding any other provision of this agreement, the Publisher shall have the right to do the following:

      A.     To distribute newspapers and transaction sheets to the field in any form or manner determined by management and to count and tie newspapers in the field by persons not covered by this agreement. However the Publisher's right to tie newspapers in the field shall not be construed as a right to prepare newspapers in the field for wholesale redistribution to other distribution centers.

(J.A. 40).

The second relevant provision of the CBA is contained in Addendum No. 4., which has been in effect since November 21, 1978, as part of each of the sequential collective bargaining agreements governing the parties' relationship. Notably, there is no dispute that Addendum No. 4 is part of the CBA presently at issue. Addendum No. 4 provides as follows:

THIS AGREEMENT, made this 21st day of November, 1978, between NORTHWEST PUBLICATIONS, INC., Publisher of the St. Paul Pioneer Press and Dispatch and MINNEAPOLIS-ST. PAUL MAILERS' UNION #4, shall be attached to, and made part of, the present collective bargaining agreement.

    A.  The intent of this Agreement is as follows:

          1.     The Publisher shall have no restrictions on his method of bulk distribution other than the inserting of a minimum of 40,000 complete Sunday papers by Mailroom personnel {40,000 changed to 20,000 effective 11-1-83}.

– 3 –

2.  The balance of the Sunday paper may be distributed in a maximum of three separate parts. Inserting {if any} into the three separate parts will be done by Mailroom personnel.

3.  In the event of any conflict between this supplemental agreement and any provision of the collective bargaining agreement between Minneapolis-St. Paul Mailers' Union #4 and Northwest Publications, Inc. . . . the terms of this supplemental agreement shall control. . . .

B.  In recognition of the above agreement, the Publisher agrees to provide the following benefits:

1.  DENTAL PLAN

    Effective the first month after signing of the Agreement, the Publisher will contribute to a Dental Plan, selected by the Union, a maximum of $25 per month for all regular situation holders in the Mailroom who elect to enroll in the plan. The Publisher shall have no liability in respect to the plan other than the stated contribution {increased to $42.05 per month effective 11-1-83}.

2.  HOSPITALIZATION

    Effective with the first payroll deduction following the signing of this agreement, the Company contribution to the group hospital plan specified in the first paragraph of Section 22 of the Collective Bargaining Agreement is increased to 100%.

Effective with the first payroll deduction following signing of this Agreement, the Publisher will pay the full cost of Group Health {HMO} coverage for each employee so enrolled up to an amount equal to 110% of the premium required for the applicable coverage in the group hospitalization plan specified in Section 22 of the current Agreement.

3. ITU NEGOTIATED PLAN

The Publisher's contribution to the ITU Negotiated Pension Plan shall be increased by 1/2% effective May 1, 1978, for a maximum of 4-1/2%.

4. ONE DAY VACATION

Vacations may be taken one day at a time by notifying the Chairman, subject to the approval of the Foreman.

(J.A. 71-72) (emphasis added).

Also of relevance to the issues on appeal, the record contains an internal memorandum of the Company in which a Company negotiator contemporaneously summarized for management his understanding of the agreement which formally became Addendum 4 (the 1978 Internal Memo). In relevant part, the 1978 Internal Memo provides as follows:

The parties agreed also to a change in the concept of jurisdiction in that the union stated the company must insert a minimum of 40,000 "Complete Sunday Papers." In the exchanges on this subject it is important to remember what the understandings of the parties were on this 40,000 completes.

(1) This is the total liability of the Company.

> (2)    The union stated it did not care to when [sic] these completes were distributed.
>
> (3)    The Company can distribute the rest of its circulation in any manner and to whomever it chooses so long as it is not over three pieces.
>
> It is clearly understood that management need not concern itself that these completes be distributed to single copy distributors.
>
> (4)    The union stated what it was giving to management was "Bulk Delivery" as opposed to its current odd counts etc. delivery.
>
> (5)    The union stated management attorneys should write the language which would reflect this understanding.
>
> Note: It is important that the language reflect this is a modification of the union's jurisdiction on inserting the total product - and that its only obligation is to a number (40,000 completes) and further the rest of the distribution would be at the discretion of the company.

(J.A. 76-77).

Also of relevance in this appeal is the CBA's clause providing that all grievances first be presented to a Local Joint Standing Committee, and then if still unresolved, to arbitration:

> **Section 7. Grievance Procedure.** A local joint standing committee of two representatives shall be selected by the Publisher and a like committee of two shall be selected by the Union, and in case of a vacancy, absence or refusal of either of such representatives to act, another shall be appointed to serve in his/her stead. <u>To this Local Joint Standing Committee shall be referred all questions which may arise as to the construction to be placed on any clause of this contract, or alleged</u>

violation thereof, all disputes regarding discharged employees, which cannot be settled otherwise. . . . This Committee shall not have authority to create new conditions or add new provisions to this contract nor shall it have any authority with regard to interim openings. Should this Local Joint Standing Committee be unable to agree within ten (10) days then it shall refer the matter to a board of arbitration . . . . The decision of this arbitration board on any matter referred to it shall be by majority vote and shall be final and binding upon both parties.

(J.A. 41) (emphasis added).

We now turn to the historical facts giving rise to the present dispute. For over thirty years, the Sunday edition of the St. Paul Pioneer Press was distributed to home delivery carriers in bundles of separate sections, such that the newspapers were not fully inserted when they left the mailroom. In early 1990, the Union learned that the Sunday papers were being delivered to customers' homes as fully-inserted single packages, despite continuing to leave the printing facility in separate bundles. The Union brought this issue to the attention of the Company, contending that any insertion work done by home delivery carriers contravened the CBA.

The Company responded that the delivery persons were independent contractors, as opposed to employees, who were making autonomous decisions to insert the papers and deliver them as such, and over whom the Company had no control. This dispute continued informally until the Union filed a formal grievance in September 2000, claiming violations of the jurisdictional provision of the CBA, Section 6, based on the Company's alleged use of non-Union personnel to perform insertion work. The grievance was submitted to the Local Joint Standing Committee, which could not resolve the matter. Notably, the Company did not argue the applicability of Addendum No. 4 in support of its position before the Joint Standing Committee.

Subsequently, in September 2001, the matter went to arbitration before a single neutral arbitrator (the Arbitrator).[3] The stipulated issue statement presented the following questions to the Arbitrator: "Did the Company violate its jurisdictional agreements with Local 4 by having inserting work performed at distribution centers by non-union personnel? If so, what is the appropriate remedy?" (J.A. 19).

In contrast to its case before the Joint Standing Committee, before the Arbitrator, the Company argued the applicability of Addendum No. 4 to resolve the insertion work dispute. Specifically, the Company argued that, under the plain terms of Addendum No. 4, the Company had the right to hire non-Union employees to perform any insertion work over 20,000 (previously 40,000) complete Sunday papers per week and the insertion work associated with making up the separate parts described in paragraph A.2. of Addendum No. 4.

Notably, the Union raised no objection to the Company's introduction of Addendum No. 4 as part of its case before the arbitrator. On the question of whether Addendum No. 4 resolved the insertion work dispute, the Union argued that it did not, and, in fact, argued that Addendum No. 4 supported its position. According to the Union, the reference to 20,000 papers in Addendum No. 4 refers to newspapers that will only be used for single-copy sales. Additionally, the Union argued that if Addendum No. 4 truly means what the Company says it means, the Company would have argued the applicability of Addendum No. 4 during the earlier stages of the dispute. Also noteworthy is the fact that the Union raised no objection before the Arbitrator to the Company's introduction of the 1978 Internal Memo as part of its case.

---

[3]The parties waived the provision in the CBA calling for a five-person board of arbitration.

On February 24, 2002, the Arbitrator issued his Opinion and Award in which he denied the Union's grievance. According to the Arbitrator, "[o]n its face, Section 6 appears to reserve to the bargaining unit all mailing room work, which included the inserting of newspapers, without regard to the location of its performance." (J.A. 26). The Arbitrator determined, however, that although Section 6 may have originally reserved all insertion work to the bargaining unit, the Union relinquished a substantial amount of such work to the Company's discretion via Addendum No. 4 in exchange for significant economic concessions by the Company. In this regard, the Arbitrator specifically found that "[w]hat the Union retained was the right to fully insert the 20,000 (40,000 originally) complete Sunday newspapers specified in the Addendum as well as all of the insertion work associated with making up the separate parts described in paragraph A.2. of Addendum No. 4." (J.A. 28-29). The Arbitrator found that Addendum No. 4 permitted the Company to hire non-Union employees to perform the balance of any other insertion work needed.

In rejecting the Union's argument that the 20,000 papers (40,000 originally) referred only to single-copy sales, the Arbitrator relied upon the complete absence of any language in Addendum No. 4 restricting "the use or distribution of the 20,000 Sunday papers that must be fully inserted by bargaining members." (J.A. 27). The Arbitrator also relied upon the explicit statement in Addendum No. 4 that the Company "'shall have no restrictions'" on the method of bulk distribution. Id.

Moreover, the Arbitrator also stated that the 1978 Internal Memo bolstered his reading of Addendum No. 4. Indeed, the Arbitrator found the 1978 Internal Memo "is not only the best evidence of the Addendum's negotiated intent, on this record, it is the only meaningful evidence of bargaining history; no contrary documentary evidence of bargaining history was introduced and none of the witnesses who testified at arbitration were participants in that round of bargaining." Id. The Arbitrator further explained as follows:

While the internal memo represents the view of the Company's negotiators and is not signed by any Union official, a careful reading of the memo and the Addendum reveals two important considerations regarding the reliability and accuracy of the memo. First, the Addendum clearly reflects that the Company traded significant economic concessions in return for the jurisdictional modification; it provided a dental plan, increased pension contributions, and increased hospitalization benefits. The magnitude of these benefits strongly suggests that the jurisdictional change was also intended to be a substantial concession to the Company. Second, the content of the memo closely parallels the content of the Addendum, which the Union did sign; in other words, what the memo says were the terms of the settlement actually turned out to comprise the terms of the Addendum. For example, the memo says that the ability to take vacations a day at a time were one of the terms of settlement. A provision allowing for day at a time vacation appears as the final benefit of the Addendum. For another example, the memo says a dental plan would be provided as part of the trade-off. The Addendum text provides for a dental plan as it was described in the memo. The same is true of the increased pension and hospitalization benefits; they appear in the text of the Addendum as they were described in the memo. This strongly suggests that the memo was a true reflection of the parties' intent in the negotiations for the Addendum.

* * *

As a result of the foregoing considerations, the arbitrator concludes that the internal memo does accurately describe the parties' intent underlying the jurisdictional change.

(J.A. 28).

In the United States District Court for the District of Minnesota, the Union filed the present challenge to the Arbitrator's Opinion and Award, pursuant to the Federal Arbitration Act. 9 U.S.C. § 10(a). For the first time, the Union argued the Arbitrator lacked contractual authority to consider Addendum No. 4 on the basis that the CBA

required interpretive questions regarding Addendum No. 4 to first be exhausted before the Joint Standing Committee.[4]  Additionally, the Union argued before the district court that the Arbitrator erroneously considered the 1978 Internal Memo as such document was not prepared by a neutral party and erroneously failed to consider evidence of the parties' past practices regarding insertion work.

On cross motions for summary judgment, the district court denied the Union's motion for summary judgment, granted the Company's motion for summary judgment, and confirmed the arbitration award.  The Union noted this timely appeal.  We have jurisdiction pursuant to 9 U.S.C. § 16(a)(1)(D).

## II.

On appeal, the Union initially argues the district court's confirmation of the arbitration award in favor of the Company (the Arbitration Award) should be reversed, because the Arbitrator exceeded the scope of his contractual authority in considering and relying on Addendum No. 4 without interpretive questions regarding Addendum No. 4 having first been submitted to the Joint Standing Committee.  Alternatively, the Union argues the district court's confirmation of the Arbitration Award should be reversed, because it does not draw its essence from the CBA.

A.     Scope and Standard of Review.

A district court's scope of review of an arbitrator's award is extremely limited and deferential.  Gas Aggregation Servs., Inc. v. Howard Avista Energy, LLC, 319 F.3d 1060, 1064 (8th Cir. 2003).  Indeed, a district court must confirm an arbitration award if it "draws its essence from the collective bargaining agreement" at issue, United Steelworkers v. Enter. Wheel & Car Corp., 363 U.S. 593, 597 (1960).  Titan

---

[4]Indeed, in an extensive post-hearing brief submitted by the Union and considered by the Arbitrator before the Arbitrator issued his final decision, the Union raised no objection to the Arbitrator's consideration of Addendum No. 4.

Wheel Corp. v. Local 2048, Int'l Ass'n of Machinists, 253 F.3d 1118, 1119 (8th Cir. 2001). In other words, an arbitration award must be confirmed "[e]ven if the court is convinced that the arbitrator committed serious error, so long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority . . . ." Gas Aggregation, 319 F.3d at 1064 (internal quotation marks omitted).

In reviewing the district court's decision upholding an arbitration award, "[w]e apply ordinary, not special, standards . . . ." MidAmerican Energy Co. v. International Bhd. of Elec. Workers, 345 F.3d 616, 619 (8th Cir. 2003) (internal quotation marks omitted) (on review from grant of summary judgment enforcing arbitration award).

> Thus, we review a district court's findings of fact for clear error and conclusions of law de novo. Our review of the District Court's decision to grant summary judgment is de novo. We review the grant of summary judgment de novo even though the enforcement of an arbitration award is involved.

> Judicial review of arbitration rulings is limited. Indeed, we have observed that the decision of an arbitrator who has not exceeded his contractual authority is almost always upheld.

Id. (internal quotation marks and citations omitted).

With these legal precepts and standard of review in mind, we turn to address the Union's arguments on appeal.

B.    The Union's Exhaustion Argument.

In support of its exhaustion argument, the Union relies upon language in Section 7 of the CBA requiring that "all questions which may arise as to the construction to be placed on any clause of this contract" be referred to the Joint Standing Committee, and if unresolved by such committee, the committee shall refer the matter to arbitration. (J.A. 41). Because the parties never presented interpretive questions

regarding Addendum No. 4 to the Joint Standing Committee in connection with the Union's formal grievance over insertion work, the Union argues the Arbitrator acted beyond its contractual authority in considering and relying on Addendum No. 4.

We assume arguendo that, pursuant to Section 7 of the CBA, the Union had a contractual right to insist that any interpretive questions regarding Addendum No. 4 first be submitted to the Joint Standing Committee for resolution before being considered by the Arbitrator.  Such an assumption, however, is of no aid to the Union, because, we hold the Union waived such right by willingly and without reservation allowing the Arbitrator to consider Addendum No. 4 in his resolution of its grievance. Slaney v. International Amateur Athletic Fed'n, 244 F.3d 580, 591 (7th Cir. 2001) ("'If a party willingly and without reservation allows an issue to be submitted to arbitration, he cannot await the outcome and then later argue that the arbitrator lacked authority to decide the matter.'").

While the Union implies that it lacked the opportunity to object to the Arbitrator's consideration of Addendum No. 4, the record belies such an implication. The record establishes that the Arbitrator gave the Union the opportunity to present evidence or argument in rebuttal to the Company's case, even allowing the Union to submit a lengthy post-hearing brief.  Neither in its rebuttal case nor in its post-hearing brief did the Union cry prejudice from the timing of the Company's introduction of Addendum No. 4 or that the Arbitrator lacked the authority to consider Addendum No. 4.  Indeed, during the last one and one-half days of the arbitration proceeding, the Union argued Addendum No. 4 supported its position.  These circumstances leave no doubt the Union waived its contractual right to insist that any interpretive questions regarding Addendum No. 4 be submitted to the Joint Standing Committee before being considered by the Arbitrator.

  C. The Union's Argument That The Arbitration Award Does Not Draw Its Essence From The CBA.

Alternatively, the Union contends the Arbitration Award does not draw its essence from the CBA because the Arbitrator relied solely on the 1978 Internal Memo, a Company friendly document, to discern the parties' intent as to the meaning of Addendum No. 4. Additionally, the Union argues that in order to reach the decision he did, the Arbitrator must have blatantly ignored Union-favorable evidence of past practices regarding the insertion work.

The Union's position is without merit on all points. While an arbitrator may not amend a contract or contradict its express terms, he nonetheless "may look to sources other than the collective bargaining agreement . . . to aid in his interpretation of the contract . . . ." Keebler Co. v. Milk Drivers & Dairy Employees Union, Local No. 471, 80 F.3d 284, 288 (8th Cir. 1996). See also Iowa Beef Processors, Inc. v. Amalgamated Meat Cutters & Butcher Workmen of N. America, AFL-CIO, 627 F.2d 853, 857 (8th Cir. 1980) ("The arbitrator has a right to interpret and apply the contract and in doing so to consider not only the formal agreement but collateral materials as well including past prevailing practices in the company plant."). Thus, the Arbitrator was not prohibited from considering the 1978 Internal Memo to aid his interpretation of the CBA. Moreover, the record shows that the Arbitrator did not rely exclusively on the 1978 Internal Memo as the Union asserts. Rather, after evaluating its credibility, the Arbitrator relied on the document merely to bolster his understanding of the plain language of the Addendum.

Additionally, as the district court aptly stated:

> A review of the Award reveals that the Arbitrator thoroughly considered the history of the dispute over insertion work and the parties' attendant actions and interactions, the respective positions of the Union and the Company and the pertinent language of the CBA and the Addendum. See Award at 3-12. Even if the Court were to determine, as the Union adamantly asserts, that the Arbitrator disregarded testimony as to past practice and ultimately drew an incorrect conclusion, such would not provide justification for overturning the Award. See Midwest Coca-Cola Bottling Co. v. Allied Drivers, Local 792, 89 F.3d 514, 517, 518

(8th Cir. 1996) (expressing that a difference of opinion regarding interpretation is an insufficient ground for reversal of arbitrator's award) (citing Enterprise, 363 U.S. at 599). The role of judicial review is merely to assess whether or not the decision of the arbitrator reflects an arguable interpretation of the agreement. Gas Aggregation, 319 F.3d at 1064. If so, even a belief that the arbitrator "has committed serious error" does not permit a court to substitute its conclusion for that of the arbitrator. Midwest, 89 F.3d at 517. The Award in this case establishes that, pursuant to his contractual authority, the Arbitrator rendered a decision based expressly on the terms of the relevant CBA provisions, viewed in light of a document he found to be "the only meaningful evidence of bargaining history." Award at 10. Accordingly, the Award draws its essence from the CBA between the Union and the Company.

(J.A. 346-47).

We find no flaw in the district court's analysis. "An arbitrator's paramount obligation is to apply the parties' agreement in a way that gives effect to their intent." Boise Cascade Corp. v. Paper Allied-Indus., Chem., and Energy Workers, Local 7-0159, 309 F.3d 1075, 1081 (8th Cir. 2002). That is exactly what the Arbitrator did in this case. Indeed, there is no doubt that the Arbitration Award draws its essence from the CBA.

### III.

In conclusion, we hold the Arbitrator did not exceed the scope of his authority and the Arbitration award draws its essence from the CBA. Accordingly, we affirm the district court's grant of summary judgment in favor of the Company enforcing the Arbitration Award.

————————————