In the

# United States Court of Appeals
### For the Seventh Circuit

Nos. 05-2282 & 05-2302

HICKLIN ENGINEERING, L.C.,

*Plaintiff-Appellant*, *Cross-Appellee*,

*v.*

R.J. BARTELL AND R.J. BARTELL & ASSOCIATES, L.L.C.,

*Defendants-Appellees*, *Cross-Appellants*.

Appeals from the United States District Court
for the Eastern District of Wisconsin.
No. 00-C-1516—**Patricia J. Gorence**, *Magistrate Judge*.

ARGUED JANUARY 11, 2006—DECIDED FEBRUARY 22, 2006

Before FLAUM, *Chief Judge*, and EASTERBROOK and MANION, *Circuit Judges*.

EASTERBROOK, *Circuit Judge*. Axi-Line Precision Products designs and makes testing equipment for auto and truck transmissions. Since 1998 Axi-Line has been a division of Hicklin Engineering. Between 1993 and 2000 R.J. Bartell, an engineer, worked part-time for Axi-Line. He did not sign a restrictive covenant or confidentiality agreement. After Bartell began a competing business (R.J. Bartell & Associates) that sells transmission testing equipment, Hicklin filed this suit under Wisconsin's version of the Uniform Trade Secrets Act. Wis. Stat. §134.90. The

parties agreed to final decision by a magistrate judge, see 28 U.S.C. §636(c), and Bartell prevailed on summary judgment; the judge also sanctioned Hicklin for its refusal to admit that Bartell had worked for Axi-Line as an independent contractor rather than as an employee. See Fed. R. Civ. P. 37(c). Hicklin appeals from these decisions. Bartell, who wants additional recompense for the expense of litigation, has filed a cross-appeal.

Two procedural issues come ahead of the merits. Subject-matter jurisdiction is the first. Both plaintiff Hicklin Engineering, L.C., and defendant R.J. Bartell & Associates, L.L.C., are limited liability companies. (The abbreviations differ because they were organized under different states' laws; they mean the same, just as both "Corp." and "Inc." designate corporations.) The district court assumed that a limited liability company, like a corporation, has two citizenships: its state of organization and its principal place of business. That's not right. The citizenship of a limited liability company is that of its members, see *Cosgrove v. Bartolotta*, 150 F.3d 729 (7th Cir. 1998), and its members may include partnerships, corporations, and other entities that have multiple citizenships. See *Carden v. Arkoma Associates*, 494 U.S. 185 (1990). A federal court thus needs to know each member's citizenship, and if necessary each member's members' citizenships.

R.J. Bartell & Associates has only one member, Bartell, who is a citizen of Wisconsin. Hicklin has a more complicated structure. Its jurisdictional statement under Circuit Rule 28(a)(1) listed the states of which lawyers deemed the members to be citizens but gave no details, and its corporate disclosure statement under Fed. R. App. P. 26.1 and Circuit Rule 26.1 was faulty. So at oral argument we directed counsel to file a supplemental statement detailing Hicklin's members and their citizenships. The statement reveals that Hicklin has 65 members, some of which have multiple citizenships—and some of these posed

complex legal issues. For example, its members include trusts of which national banks are trustees. The citizenship of a trust is that of the trustee, see *Navarro Savings Ass'n v. Lee*, 446 U.S. 458 (1980), and until *Wachovia Bank v. Schmidt*, 126 S. Ct. 941 (2006), issued six days after this appeal was argued, there was a distinct possibility that national banks would be deemed citizens of every state in which they had offices. But *Wachovia Bank* held that national banks are citizens only of the states in which their main offices are located, and that decision saves this case from a jurisdictional dismissal even though it turns out that the list of citizenships that counsel furnished in the Circuit Rule 28(a)(1) statement is incorrect. Hicklin's members include citizens of Alaska, Iowa, North Dakota, Minnesota, and Missouri, but none is a citizen of Wisconsin.

The second procedural question is whether we can discuss in public the district court's reasoning. Magistrate Judge Gorence ordered the district clerk to keep both of her substantive opinions under seal—not just portions that revealed trade secrets, but the whole opinions. The resolution of this litigation thus has been concealed from the public. The judge did not explain what authority permits a federal court to issue entire opinions in secret. Redacting portions of opinions is one thing, secret disposition quite another. We have insisted that litigation be conducted in public to the maximum extent consistent with respecting trade secrets, the identities of undercover agents, and other facts that should be held in confidence. See, e.g., *Baxter International, Inc. v. Abbott Laboratories*, 297 F.3d 544 (7th Cir. 2002); *Grove Fresh Distributors, Inc. v. Everfresh Juice Co.*, 24 F.3d 893 (7th Cir. 1994); *In re Continental Illinois Securities Litigation*, 732 F.2d 1302 (7th Cir. 1984). See generally *Nixon v. Warner Communications, Inc.*, 435 U.S. 589 (1978). This means that both judicial opinions and litigants' briefs must be in the public record, if necessary in parallel versions—one full version containing all details,

and another redacted version with confidential information omitted. Hicklin has filed multiple briefs using this procedure; the sealed brief contains a trade secret diagram omitted from the public brief but otherwise is identical.

What happens in the federal courts is presumptively open to public scrutiny. Judges deliberate in private but issue public decisions after public arguments based on public records. The political branches of government claim legitimacy by election, judges by reason. Any step that withdraws an element of the judicial process from public view makes the ensuing decision look more like fiat and requires rigorous justification. The Supreme Court issues public opinions in all cases, even those said to involve state secrets. See *New York Times Co. v. United States*, 403 U.S. 713 (1971). A district court issued public opinions in a case dealing with construction plans for hydrogen bombs. *United States v. Progressive, Inc.*, 467 F. Supp. 990, rehearing denied, 486 F. Supp. 5 (W.D. Wis.), appeal dismissed, 610 F.2d 819 (7th Cir. 1979). We issued a public opinion in a case whose subject was attorney-client confidences that required the parties' names and many details to be withheld. See *A Sealed Case*, 890 F.2d 15 (7th Cir. 1989). It is impossible to see any justification for issuing off-the-record opinions in a dispute about drawings of transmission testing equipment. We inquired at oral argument whether the district court's opinions contain any information that Hicklin claims as a trade secret; we were told that they do not. Accordingly, there is no reason even for redaction. The Clerk of this court will place the district court's opinions in the public record. We hope never to encounter another sealed opinion.

Bartell did not promise to avoid future competition with Axi-Line. Nor did he promise in writing not to use his drawings and ideas for any other entity. The district court concluded that this means that Bartell may do as he pleases with any information that Axi-Line furnished him,

plus whatever he developed on his own. The second half of this proposition is unimpeachable. As an independent contractor, Bartell presumptively owned his work product. See *Community for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989). He was free to sell engineering solutions to Axi-Line on either an exclusive or a non-exclusive basis, just as lawyers may sell their legal solutions to clients on an exclusive or non-exclusive basis. In the absence of an agreement, non-exclusivity is the norm. See *ConFold Pacific, Inc. v. Polaris Industries, Inc.*, No. 05-1285 (7th Cir. Jan. 10, 2006), slip op. 11-14 (Wisconsin law).

Thus a lawyer who develops a new form contract, securities indenture, or tax shelter when working for Client X may reuse the language when dealing with Client Y, or may publish the language in a treatise for all to see and emulate, unless he has promised X to keep silent. A software programmer, working as an independent contractor for Client Z, who develops a novel way to organize a database may re-use the source code for another client's project, unless he promises otherwise. Norms of the trade might reverse this presumption, but Hicklin has not proffered any evidence that a mechanical engineer's human capital or knowledge, built up when working for a client, belong to that client rather than the engineer.

Things are otherwise when the client rather than the independent contractor develops the information. Then the client presumptively owns the data, and the contractor may use it only with the client's consent. Again the legal profession supplies an example. Bidder decides to make a tender offer for Target and supplies that information to Lawyer so that the necessary forms and contracts may be prepared. Lawyer is free to use (or re-use) form templates developed when working for other clients but is not free to disclose (or trade on) the impending offer, for that information is Bidder's property. See *United States v. O'Hagan*, 521 U.S.

642 (1997). By working on the deal, Lawyer did not acquire any property rights in the information Bidder supplied.

The law of trade secrets follows the same approach to ownership, both in general, see *Restatement (Third) of Unfair Competition* §43 comment c (1995), and in Wisconsin. See Wis. Stat. §134.90(2)(a) plus the definition of "improper means" in §134.90(1); *RTE Corp. v. Coatings, Inc.*, 84 Wis. 2d 105, 117-18 (1978) ("Where what is thought to be a trade secret is disclosed [to an independent contractor], the question posed is whether, under the circumstances, the recipient of the information knew or should have known that the information is a trade secret and that the disclosure was made in confidence. . . . A confidential relationship does not arise when the parties are dealing at arm's length and the recipient has not been put on notice of the confidential nature of the disclosure."). See also 2-7 *Milgrim on Trade Secrets* §7.01[9][e] (discussing the situation of consulting engineers). So Bartell did not acquire any rights in Axi-Line's trade-secret data just because he used those data in the performance of his duties.

Would the record permit a reasonable jury to find that Bartell knew that Axi-Line treated at least some of the data it provided as trade secrets? It would. The information's nature—dimensions, materials, and tolerances on the parts used to make dynamometers and other equipment—is one reason. Many of these details (especially materials and tolerances) would be hard to obtain by reverse engineering. See *United States v. Lange*, 312 F.3d 263 (7th Cir. 2002) (criminal conviction for disclosing information of this kind). Axi-Line's safeguards, of which Bartell knew, are another reason. The firm took standard precautions, such as perimeter fences, excluding unescorted visitors, and keeping data under lock and key. Bartell himself suggested to Axi-Line that certain plans (which Bartell had converted from hand-drawn blueprints to computer-assisted-design models) bear confidentiality legends, and Axi-Line told Bartell to

include appropriate legends in his CAD models. Even bearing the legend, these detailed models (and printouts made from them) were not shown to customers or competitors.

From Bartell's knowledge, and the norm that a client's information remains its property after an independent contractor has worked with the data, a reasonable jury could infer that Bartell implicitly agreed to use the data for Axi-Line's benefit rather than his own. Wisconsin does not require an express, written contract of confidentiality. *RTE* says as much, and although that decision predates the state's adoption of the Uniform Trade Secrets Act, every decision we could find applying that statute holds that an implied undertaking to abide by the trade's norms of confidententiality suffices. See, e.g., *News America Marketing In-Store, Inc. v. Marquis*, 86 Conn. App. 527, 862 A.2d 837 (2004); *Frantz v. Johnson*, 116 Nev. 455, 999 P.2d 351 (2000); *Stampede Tool Warehouse, Inc. v. May*, 272 Ill. App. 3d 580, 651 N.E.2d 209 (1st Dist. 1995); *Marsico v. Cole*, 1995 Del. Ch. LEXIS 78 (1995). And breach of an implicit promise to hold information for the client's sole benefit in turn violates the Trade Secrets Act, Wis. Stat. §134.90(2)(a).

There remains the question whether Bartell did disclose or use Axi-Line's confidential information improperly. Bartell contends that he did not reveal to anyone else the CAD models that he built using Axi-Line's data but just looked at them to ensure that the new plans he was creating for his own business did not contain any obvious blunders. Whether that is permissible under Wisconsin law is an interesting question, but not one we need resolve, given Hicklin's contention that Bartell copied and used the trade secrets wholesale rather than capitalizing on more general knowledge that he had gained while working on testing gear. There will be time enough to address the legal issue if the trier of fact should conclude that Bartell's "just checking" version is the right one.

On remand the parties and trier of fact will need to separate Axi-Line's contributions (which Hicklin owns) from Bartell's (which he owns), determine which of Axi-Line's data are trade secrets, ascertain whether Bartell recognized that these data are confidential, pin down the use that Bartell made of those trade secrets, and if necessary decide whether Wisconsin law permits such a use. If Hicklin prevails on these issues, the district court will have to select an appropriate remedy.

Hicklin has presented additional legal theories, but the district court need not consider them. These common-law approaches have been superseded by the Trade Secrets Act. See §7(a) of the Uniform Trade Secrets Act, enacted as Wis. Stat. §134.90(6); *ConFold*, slip op. 12-14 (Wisconsin law); *Hecny Transportation, Inc. v. Chu*, 430 F.3d 402 (7th Cir. 2005) (discussing the Illinois version of this provision). They would in any event add little or nothing to the statutory remedy, so they should be put to one side if only to stream-line the litigation.

With respect to the award of attorneys' fees under Rule 37(c)(2), the district court acted properly. Hicklin alleged, ambiguously, that "Axi-Line engaged [Bartell's] services." Bartell asked Hicklin to admit that he had been engaged as an independent contractor rather than an employee. Hicklin refused to do this, and Bartell supported his position so thoroughly that Hicklin now concedes the matter. Rule 37(c) directs (and does not just permit) a district court to award attorneys' fees and other costs to the party put to such proof by refusal to admit. Hicklin now contends that this issue was so transparently irrelevant to the litigation that Bartell should have saved the expense of proof. That's legally wrong; the distinction between employee and independent contractor affects who (presumptively) owns the work product, as *Community for Creative Non-Violence* shows. Anyway, if this was beside the point, why did Hicklin refuse to admit that Bartell was an independent contractor? Its

intransigence has led us to wonder what other issues in this litigation have been raised more for the expense they will force Bartell to bear than for their merit or salience.

Because Hicklin has largely prevailed on this appeal, Bartell's cross-appeal—which asks us to hold that Hicklin's suit lacks a reasonable basis and thus leads to fee-shifting under Wis. Stat. §134.90(4)(c)—is unavailing. But if on remand Bartell demonstrates that Hicklin has been exaggerating with respect to the facts, the district court should take a fresh look at the subject.

The judgment is vacated (except with respect to the award under Rule 37) and the case is remanded for proceedings consistent with this opinion.

A true Copy:

      Teste:

                                _____

                                *Clerk of the United States Court of Appeals for the Seventh Circuit*