# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-3800

_____

Wells Fargo Bank, N.A.,       *

           *

      Appellee,       *

           *    Appeal from the United States

      v.       *    District Court for the

           *    District of Minnesota.

WMR e-PIN, LLC; e-Banc, LLC;       *

Synoran, Inc.,       *

           *

      Appellant.       *

_____

Submitted: April 1, 2011

Filed: September 2, 2011 (Corrected: 11/8/11)

_____

Before WOLLMAN, MURPHY, and GRUENDER, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Synoran, LLC (Synoran)[1] and WMR e-Pin LLC (e-Pin) appeal from the district court's[2] confirmation of an arbitration award of $1.865 million in favor of Wells Fargo, N.A., which had prevailed on its claims for breach of contract and for

_____

[1]Synoran, LLC is the successor to e-Banc, LLC. For clarity's sake, we will refer to the entity that was formerly e-Banc as Synoran throughout this opinion.

[2]The Honorable Joan N. Ericksen, United States District Judge for the District of Minnesota, adopting the report and recommendation of the Honorable Franklin L. Noel, United States Magistrate Judge for the District of Minnesota.

misappropriation of trade secrets. Appellants maintain that the district court lacked jurisdiction to confirm the award, erred in confirming the award, and abused its discretion in denying their motion to amend or terminate a permanent injunction issued as part of the award. We affirm.

I.

In 2001, Wells Fargo entered into a business relationship with appellant Synoran. The parties outlined the terms of the relationship in a Software Licensing Agreement (SLA), an umbrella agreement to be fleshed out by subsequent agreements between the parties. Under the SLA, Synoran would provide consulting services and software products to Wells Fargo that related to its management of customer accounts.

In 2003, Wells Fargo sought additional consulting services from Synoran related to the development of its Digital Information Exchange software (DIXE Software). The DIXE Software adopted a "distributed network" approach that Wells Fargo deemed proprietary. Wells Fargo and Synoran entered a second agreement (DIXE Consulting Agreement), under which Wells Fargo reserved certain intellectual property rights associated with the DIXE Software and acknowledged that certain other intellectual property rights associated with a "central switch" approach belonged to appellant e-Pin.

In 2004, Wells Fargo and e-Pin executed a Patent License Agreement (PLA) through which Wells Fargo acquired a license to use certain products patented by e-Pin that relate to check clearing and check settlement services. The PLA incorporated by reference the dispute resolution procedures from the SLA, which provided that any dispute must be resolved through arbitration. Of particular relevance to this appeal are provisions that relate to the scope of the arbitration proceeding and the forms of relief available to the parties:

Arbitrators (i) shall resolve all Disputes in accordance with the substantive law of the state in which the arbitration is held, (ii) may grant any remedy or relief that a court of the state in which the arbitration is held could order or grant with the scope here of and such ancillary relief as is necessary to make effective any award; and (iii) shall have the power to award recovery of all costs and fees, to impose sanctions and to take such other actions as they deem necessary to the extent a judge could pursuant to the Federal Rules of Civil Procedure, or other applicable law.

[. . .]

Any award in arbitration under this Section shall be limited to monetary damages and shall include no injunction or direction to any party other than the direction to pay a monetary amount.

J.A. Ex.000029 at ¶ 7, ¶ 9.

After e-Pin and Wells Fargo executed the PLA, e-Pin assigned certain patent interests to DataTreasury Corporation (DTC). DTC sued Wells Fargo for patent infringement. Wells Fargo invoked the dispute resolution procedures and initiated arbitration proceedings against e-Pin and DTC. DTC contended that it was not subject to arbitration and was ultimately dismissed. Synoran intervened and together with e-Pin asserted counterclaims against Wells Fargo arising from their rights under the SLA.

In July 2008, a three-member arbitration panel (the Panel) convened and heard twelve days of testimony. In its findings of facts and conclusions of law, the Panel dismissed the appellants' counterclaims, found in favor of Wells Fargo on its claims for breach of the SLA and misappropriation of the DIXE software trade secrets, and ordered that "Synoran and WMR e-Bank LLC" pay $1,265,000.00 in attorneys' fees

and $600,000.00 in costs.[3]  The Panel also permanently enjoined the appellants from using or disclosing the DIXE software trade secrets.

In October 2008, Wells petitioned the district court to confirm the arbitration award (the Award).  Before ruling on that petition, the district court heard argument from the parties regarding its jurisdiction, ultimately concluding, over appellants' objection, that the prerequisites of subject-matter jurisdiction had been satisfied.  The appellants filed a cross-motion to vacate or modify the Award, arguing that the Panel had exceeded its authority when it 1) granted injunctive relief in violation of the governing arbitration procedures, 2) awarded attorneys' fees, and 3) concluded that Wells Fargo was the "inventor and owner" of the DIXE software trade secrets.

The district court denied appellants' motion to vacate or modify and granted Wells Fargo's motion to confirm.  It entered a judgment of $1,685,000 against the appellants and permanently enjoined them from disclosing or otherwise making use of the DIXE software trade secrets.  Appellants moved to alter the judgment, asking the district court to lift the permanent injunction on the ground that Wells Fargo had made public the DIXE software trade secrets when it filed patent application with the United States Patent and Trademark Office.  Appellants argued that the information no longer constituted a trade secret and that the injunction against its use or disclosure should be lifted.  The district court denied that motion, and this appeal followed.

Appellants ask that we vacate the district court's confirmation of the award for lack of subject-matter jurisdiction.  In the alternative, they ask that we reverse the confirmation of the arbitration award, vacate the finding that Wells is the "inventor"

---

[3]The original order misidentified WMR e-Pin as "WMR e-Bank."  The Panel later amended the award to correct this mistake, and we refer to the amended award throughout the remainder of this opinion.

-4-

of the DIXE software trade secrets, vacate the award of attorneys' fees and costs against e-Pin, and lift the permanent injunction against them.

## II.

Appellants contend that the district court lacked subject matter jurisdiction to confirm the Award. We review *de novo* questions of subject matter jurisdiction. Sac & Fox Tribe v. Bureau of Indian Affairs, 439 F.3d 832, 835 (8th Cir. 2006). Federal subject matter jurisdiction exists if the amount in controversy exceeds $75,000 and the suit is between citizens of different states. 28 U.S.C. §1332(a)(1). The parties agree that the amount in controversy element has been satisfied, but dispute whether they are diverse parties.

Appellant Synoran is a citizen of several states, including California. Appellants maintain that Wells Fargo is a citizen of California, its principal place of business, and of South Dakota, where its main office is located. They argue that the district court erred in holding that Wells Fargo, as a national bank, is deemed a citizen only of the state in which its main office is located.[4]

---

[4]Appellants claim that Wells Fargo is estopped from denying that it is a citizen of California because the district court in Mont v. Wells Fargo Bank, N.A., No. CV 08-6298, 2008 WL 5046286 (C.D. Cal) found that it was and therefore remanded the case to state court after Wells Fargo had removed it. In such a circumstance, 28 U.S.C. 1447(d) bars appellate review of any order remanding a case to the state court from which it was removed. See Things Remembered, Inc. v. Petraca, 516 U.S. 124, 127-28 (1995). According to case law from other circuits, a non-appealable remand order lacks preclusive effect and is to be adjudged on its own merits. See, e.g., Health Cost Controls of Ill., Inc. v. Washington, 187 F.3d 703, 708 (7th Cir. 1999); Winters v. Diamond Shamrock Chem. Co., 149 F.3d 387, 395 (5th Cir. 1998); Alliance to End Repression v. City of Chicago, 820 F.2d 873, 875 (7th Cir. 1987). Therefore, we find appellants' collateral estoppel argument unpersuasive and decline to give preclusive effect to the findings of the district court from California in an unrelated matter.

National banks are "corporate entities chartered not by any State, but by the Comptroller of the Currency of the U.S. Treasury." Wachovia Bank v. Schmidt, 546 U.S. 303, 306 (2005). The relevant statutory language defining the citizenship of national banks for diversity purposes appears in the second paragraph of 18 U.S.C. § 1348: "All national banking associations shall, for the purposes of all other actions by or against them, be deemed citizens of the States in which they are respectively located." At issue is whether a national bank is "located" in the state of its principal place of business, if its main office is in a different state.

We begin by noting that every court to consider the meaning of § 1348 for purposes of jurisdiction has recognized that the term "located" is ambiguous. See Wachovia Bank , 546 U.S. at 318 ("To summarize, 'located,' as its appearances in the banking laws reveal . . . is a chameleon word; its meaning depends on the context in and purpose for which it is used."). Consequently, we examine the statutory history and case law in order to construe the meaning of the term "located" in § 1348.

Congress first authorized national banks in 1863, at which time they could "sue and be sued in the federal district and circuit courts solely because they were national banks, without regard to diversity, amount in controversy or the existence of a federal question in the usual sense." Mercantile Nat. Bank at Dallas v. Langdeau, 371 U.S. 555, 565–66 (1963). In 1882, Congress eliminated "federal question" jurisdiction for any lawsuit involving a national bank and created diversity jurisdiction under the same rubric as that governing state banks. See Excelsior Funds, Inc. v. JP Morgan Chase, N.A., 470 F. Supp.2d. 312, 318 n.8 (S.D.N.Y. 2006). A subsequent amendment in 1887 provided that national banks shall "be deemed citizens of the States in which they are respectively located," id. (quoting Act of March 3, 1887, §4, 24 Stat. 552, 554-55). Congress retained that phrasing without alteration in the Judicial Code of 1911, which "combined two formerly discrete provisions on proceedings involving national banks," Wachovia, 546 U.S. at 311, and retained the same phrasing once more when it amended § 1348 in 1948.

These predecessors of § 1348 demonstrated Congress's intent "to put national banks on the same footing as the banks of the state where they were located for all the purposes of the jurisdiction of the courts of the United States," Leather Manufacturers' Nat'l Bank v. Cooper, 120 U.S. 778, 780 (1887), and to "limit the access of national banks to, and their suability in, the federal courts to the same extent to which non-national banks were so limited." Wachovia, 546 U.S. at 311 (alterations omitted) (quoting Mercantile Nat. Bank at Dallas, 371 U.S. at 565–66).

Thus, the principle of jurisdictional parity emerged from the evolving statutory framework governing national banks. The more vexing question is whether that principle remained intact after Congress adopted § 1332(c)(1) in 1958, which altered the jurisdiction of state banks and corporations, such that a corporation was "a citizen of any State by which it has been incorporated *and* of the State where it has its principal place of business." (emphasis added).

Appellants, in making their case that Wells Fargo is a citizen of both South Dakota and California, rely on Firstar Bank, N.A. v. Faul, 253 F.3d 982 (7th Cir. 2001) and  Horton v. Bank One, N.A., 387 F.3d 426 (5th Cir. 2004). Firstar Bank and Horton concluded that § 1348 must be interpreted in light of § 1332 in order to honor the principle of jurisdictional parity. See Firstar Bank, 253 F.3d at 988 ("Congress passed 28 U.S.C. 1348 against an interpretive background which assumed that national banks were to have the same access to the federal courts as state banks and corporations."); Horton, 387 F.3d at 435 ("We construe section 1348 in light of Congress's intent to maintain jurisdictional parity between national banks on the one hand and state banks and corporations on the other.") Yet neither statute refers to the other or to jurisdictional parity, and neither contains language giving effect to the concept.

That this approach entailed some interpretive strain was not lost on the Seventh Circuit in deciding Firstar Bank: "Interpreting 28 U.S.C. § 1348, the current version

of which was promulgated in 1948, by referencing 28 U.S.C. § 1332(c)(1), enacted ten years later in 1958, might strike some as incongruous." 253 F.3d at 993 n.5. Nonetheless, it reasoned that "the classic judicial task of reconciling many laws enacted over time, and getting them to 'make sense' in combination, necessarily assumes that the implications of a statute may be altered by the implications of a later statute." Id. (quotation omitted). Horton likewise endorsed the proposition that the traditional concept of jurisdictional parity should continue to animate our understanding of § 1348: "Because section 1348 does not have any language modifying or rejecting the interpretive understanding that came with its predecessors, this court should presume to retain and incorporate the existing interpretive backdrop [of jurisdictional parity]." 387 F.3d at 431.

Wells Fargo rejoins that Firstar Bank and Horton overreached in concluding that a policy preference for jurisdictional parity survived in the absence of clear statutory language embodying that preference. It also contends that these cases were implicitly called into question by the Supreme Court's decision in Wachovia Bank, which held that a national bank is not a citizen of every state in which it has a branch office, but is "a citizen of the State in which its main office, as set forth in its articles of association, is located." 546 U.S. at 306. Although the Supreme Court did not consider whether a national bank is also a citizen of the state of its principal place of business, it did observe:

> To achieve complete parity with state banks and other state-incorporated entities, a national banking association would have to be deemed a citizen of both the State of its main office and the State of its principal place of business. See Horton, 387 F.3d at 431, and n. 26; Firstar Bank, N. A., 253 F.3d at 993-994. Congress has prescribed that a corporation "shall be deemed to be a citizen of any State by which it has been incorporated *and* of the State where it has its principal place of business." 28 U.S.C. § 1332(c)(1) (emphasis added). The counterpart provision for national banking associations, § 1348, however, does not refer to "principal place of business"; it simply deems such associations

"citizens of the States in which they are respectively located." The absence of a "principal place of business" reference in § 1348 may be of scant practical significance for, in almost every case, as in this one, the location of a national bank's main office and of its principal place of business coincide.

Wachovia Bank, 546 U.S. at 317 n.9.

Because Wells Fargo's main office is in a state other than that of its principal place of business, we must consider the outlier scenario identified in footnote nine of Wachovia Bank. In Excelsior Funds, Inc. v. JP Morgan Chase, N.A., the district court asserted that "the fairest reading of footnote nine is that the Supreme Court expressed skepticism over whether the term 'located' in § 1348 included a national bank's 'principal place of business,' in view of the absence of such term in the statute." Id. at 317. The Seventh Circuit has gone further, reading Wachovia Bank to reject the proposition embraced in its Firstar Bank decision that a national bank's principal place of business is an independent basis for citizenship. In Hicklin Eng'g, L.C. v Bartell, 439 F.3d 346 (7th Cir. 2005), it concluded that "Wachovia Bank held that national banks are citizens only of the states in which their main offices are located[.]" Id. at 348.

Firstar Bank and Horton modeled the citizenship of national banks after that of corporations on the strength of an assumption that Congress intended to change the meaning of the former statute when it enacted the latter in order to perpetuate jurisdictional parity. We find little support for that assumption. We are of the view that "[t]he most relevant time period for determining a statutory term's meaning is the time when the statute was enacted." Excelsior Funds, Inc., 470 F. Supp. 2d at 319 (citing MCI Telecomms. Corp. v. Am. Tel. & Tel. Co., 512 U.S. 218, 228 (1994); Perrin v. United States, 444 U.S. 37, 42-45 (1979)).

In 1948, when Congress last amended § 1348, it had not yet created principal-place-of-business citizenship. At that time the term "located" referred to the state in which the national bank had its main office, as designated by its articles of association. Moreover, when Congress introduced principal-place-of-business citizenship for state banks and corporations in § 1332(c)(1), it made no reference to jurisdictional parity, nor to national banks or § 1348. And nothing in §1348 indicates that it would incorporate by reference any subsequent change in the statutes governing jurisdiction over state banks and corporations. These circumstances strongly suggest that, with the passage of § 1332(c)(1), Congress reconfigured the jurisdictional landscape of state banks and state corporations, but left that of national banks undisturbed.

The alternative proposition—that Congress intended to alter the meaning of § 1348 retroactively when it passed § 1332(c)(1) so as to retain jurisdictional parity—is not derived from the statutory text or canons of statutory interpretation, but assumes that jurisdictional parity is an immutable principle that endures long after the statutes from which it arose have been amended and all references to it have been excised. But the statutory history suggests the opposite, as the district court's observations in Excelsior Funds, Inc. make clear:

> If Congress intended to achieve jurisdictional parity between national and state banks for all times in § 1348, and thus to include principal place of business as a location for a national bank when it became a basis for citizenship for a state bank, Congress could have provided for that in the statutory language. Indeed, several of § 1348's statutory predecessors contained express language that would have supported an argument for incorporating by reference subsequent changes to the citizenship of state banks or individual citizens. See, e.g., Act of July 12, 1882 (providing that the jurisdiction for suits involving national banking associations "shall be the same as, and not other than, the jurisdiction for suits by or against banks not organized under any law of the United States...."); Act of March 3, 1887 ("the circuit and district

-10-

courts shall not have jurisdiction other than such as they would have in cases between individual citizens of the same State"); Act of August 13, 1888 (same). However, all such language that expressly invoked the concept of parity was removed in 1911, well before the current version of the statute was enacted. See Act of March 3, 1911.

In fact, the language that expressly established parity between national banks and state banks was removed in 1887, when the language was changed to create jurisdictional parity between national banks and "individual citizens." See Act of March 3, 1887. This change undermines the argument that the concept of jurisdictional parity underlying § 1348 is a broad concept designed to trace statutory changes to the citizenship of state banks through the term "located." Rather, it suggests that the concept of jurisdictional parity underlying the statute is more limited, based on the then-existing understanding of citizenship, which would have been a single state for either state banks or individual citizens.

Excelsior Funds, Inc., 470 F. Supp. 2d. at 319-20 (statutory citations omitted). Had Congress wished to retain jurisdictional parity in 1958, it could have unequivocally done so. It did not, and consequently the concept no longer applies. Whether it ought to be revived is a policy question for Congress, not the federal courts. We will not import a jurisdictional concept into § 1348 that was unknown at the time of its adoption. Accordingly, we hold that, pursuant to § 1348, a national bank is a citizen only of the state in which its main office is located.

This interpretation accords with the position taken by the Office of the Comptroller of the Currency during oral argument in Wachovia Bank.[5] During an

---

[5] e-Pin notes that the OCC had previously asserted that a national bank, like a corporation, is susceptible to citizenship in two states based on where its main office and principal of business are located in an interpretation letter from 2002. See Office of the Comptroller of the Currency, Interp. Ltr. No. 952, at 6 (Oct. 23, 2002). Whatever occasioned the change of heart at the OCC, we credit its statement at oral argument, quoted herein, finding it both more recent and more defensible in light of

-11-

exchange between the OCC and Justice Ginsburg at the outset of the government's argument, the OCC expressly disavowed that a national bank's principle place of business provided an independent basis for citizenship:

> MR. SRINIVASAN: Thank you, Mr. Chief Justice, and may it please the Court:
>
> For purposes of determining its State citizenship under 28 U.S.C. 1348, a national banking association is located in the State in which its main office is found, not every State in which it may maintain a branch office or other form of physical presence.
>
> JUSTICE GINSBURG: What about its principal place of business if it's different from its main office?
>
> MR. SRINIVASAN: The–
>
> JUSTICE GINSBURG: Principal place of business.
>
> MR. SRINIVASAN: We--we don't think that a national banking association is a citizen of a State in which its principal place of business is found, insofar as that might be different from the State in which its main office is located.
>
> JUSTICE GINSBURG: So the main office is it, like 1332 before the '58 amendment.
>
> MR. SRINIVASAN: That's right, Justice Ginsburg, and in part, that's because of the historical chronology. The word located was first used in 1887 and the current version of section 1348 was enacted in 1948, which was 10 years before the concept of principal place of business had any jurisdictional salience. That was the first time that Congress-- this was in 1958--that Congress enacted a specific provision dealing with

---

the statutory history and text of § 1348.

corporate citizenship, and that's the first time that we see the concept of principal place of business having relevance in the jurisdictional context.

Oral Arg. at 18:22, <u>Wachovia Bank</u>, 546 U.S. 303.[6] The OCC's counsel conceded that it is not "an open and shut case" and that "one could reach the conclusion that 1332's reference to principal place of business should also apply to national banks." <u>Id.</u> at 29:06. Yet, for the reasons set forth above, we conclude that the basis for doing so is attenuated, at best. Accordingly, we reject appellants' claim that Wells Fargo is a citizen of both South Dakota and California and conclude that the district court did not err in determining that it had subject-matter jurisdiction over this action.

### III.

Appellants contend that the district court erred in denying their motion to vacate or modify the arbitration award; that the panel lacked authority to grant injunctive relief and to determine inventorship of technology subject to pending patent applications; and that the district court erred in affirming the award of attorneys' fees against appellant e-Pin, LLC.

On appeal from a district court's order confirming, modifying, or vacating an arbitration award, we review findings of fact for clear error and questions of law *de novo*. <u>Crawford Group, Inc. v. Holekamp</u>, 543 F.3d 971, 976 (8th Cir. 2008). "The district court affords the arbitrator's decisions an extraordinary level of deference and confirms so long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority." <u>Id.</u> (internal quotation marks omitted). An arbitral award may be vacated only on grounds enumerated in the Federal Arbitration Act (FAA). <u>Id.</u> (citing <u>Hall Street Assoc., LLC v. Mattel, Inc.</u>, 552 U.S. 576, 583 (2008)).

---

[6]Both the transcript and the audio recording are available at: http://www.oyez.org/cases/2000-2009/2005/2005_04_1186/argument.

A. Challenge to the Grant of Injunctive Relief

In paragraph 7(b) of the Award, the Panel ordered that appellants be "permanently restrained and enjoined from . . . asserting any ownership interest in . . . or using in any way the DIXE Trade Secrets." Appellants claim that the Panel exceeded its authority in doing so and refer us to the express prohibition outlined in the dispute resolution procedures that were to govern the arbitration: "Any award in arbitration under this Section shall be limited to monetary damages and shall include no injunction or direction to any party other than the direction to pay a monetary amount." J.A. Ex.000029 ¶ 9. Appellants contend that the Panel ignored the contract's express prohibition of injunctive relief.

The district court concluded that, because appellants had argued that an injunction should be issued against Wells Fargo during the course of the arbitration, they waived the right to challenge the grant of injunctive relief contained in the Award. It relied on the precept that "[i]f a party willingly and without reservation allows an issue to be submitted to arbitration, he cannot await the outcome and then later argue that the arbitrator lacked authority to decide the matter." Minneapolis-St. Paul Mailers Union v. Nw. Publ'ns, Inc., 379 F.3d 502, 509 (8th Cir. 2004) (quoting Slaney v. Int'l Amateur Athletic Fed'n, 244 F.3d 580, 591 (7th Cir. 2001)).

Appellants deny that their references to injunctive relief constitute a concession that it was an available remedy and contend that even if it they did affirmatively request injunctive relief, the Panel lacked the authority to grant it under the governing Commercial Rules of the American Arbitration Association (AAA Rules).

Our review of the record confirms that the appellants were on notice that Wells Fargo was seeking injunctive relief and that they sought it as well. In the pre-hearing brief Wells Fargo submitted in April 2008, it asked the Panel to enjoin the appellants from continuing the alleged misappropriation of DIXE software trade secrets.

-14-

Appellants did not object or challenge the Panel's authority at this time. This alone may not have been enough to abrogate the prohibition on injunctive relief in the parties' agreement, but appellants affirmatively requested injunctive relief on two separate instances later in the proceedings. First, in a section of their final briefing to the panel entitled "Appropriate Remedies," they asked the Panel to "[d]eclare that Wells had misappropriated . . . confidential trade secrets and enjoin Wells from using such confidential information and trade secrets[.]" J.A. Ex. 000384. And second, during closing argument, counsel for one of the appellants stated: "we think the evidence is clear that we've proven that [Wells Fargo] took this based on the litany that I just gave you, and that would be our preference that you find that they did and you enjoin them from using the software as it's defined in our proposed order." J.A. 000425. Having requested that the Panel enter injunctive relief on their behalf, appellants cannot complain when the Panel decides instead to enter injunctive relief against them.

Appellants contend that even if they did affirmatively request injunctive relief, the Panel nonetheless was precluded from granting it under Rule 43(a) of the AAA Rules. Rule 43(a) provides that "[t]he arbitrator may grant any remedy or relief that the arbitrator deems just and equitable and within the scope of the agreement of the parties . . . ." Appellants contend that this rule bars the Panel from awarding relief prohibited by the agreement, even if such relief is requested by the parties. But their position ignores the lesson of Minneapolis-St. Paul Mailers Union, 379 F.3d at 509, which teaches that the arbitrator may expand the scope of its review based on the issues the parties submit or the arguments they advance in the proceedings. We find unpersuasive appellants' argument that Minneapolis-St. Paul Mailers Union and like cases are inapposite because they did not involve a form of relief that the parties specifically prohibited in their agreement.

We conclude that the appellants have waived their right to enforce the contractual proscription on injunctive relief by failing to challenge Wells Fargo's

-15-

request for such relief and by requesting it themselves. Accordingly, the district court did not err in determining that appellants had waived their right to challenge the Panel's award of injunctive relief.

B. Challenge to the Panel's Misappropriation Determination

For similar reasons, we reject appellants' contention that the Panel exceeded its authority by determining "the inventorship of pending patent applications." One of the main issues driving the arbitration was each side's assertion that the other had misappropriated trade secrets relating to the DIXE technology. Given this posture, both parties clearly contemplated that the Panel would consider the inventorship and rightful ownership of aspects of that technology. The Panel ultimately concluded that

> Wells Fargo is the inventor and owner of all the DIXE Trade Secrets which DIXE Trade Secrets are set out within the documents entitled: (1) Digital Information Exchange "DIXE" Business Architecture and Technology Review, Version 2.0, dated August 19, 2003 and (2) The DIXE System Architecture, Version 2.0 - Working Draft, dated October 16, 2003, Wells Fargo Evidentiary Hearing Exhibits WF DIXE-35 and WF DIXE-118, respectively, all of which were misappropriated from Wells Fargo by Synoran, Inc. and WMR e-Pin LLC.

J.A. 000054 ¶ 7(a). After reviewing the record, we are satisfied that the Panel did not exceed its authority in resolving the issue of misappropriation in this fashion.

Appellants claim that they never agreed to submit the issue of inventorship. But the record is replete with instances in which the appellants staked out their position that they are the rightful owners and inventors of aspects of the DIXE software and asked the Panel to acknowledge them as such. Wells Fargo points to a number of examples in the appellants' final briefing in which it claimed to have invented, created, or developed the technology and corresponding patents before Wells Fargo subsequently stole it.

-16-

Moreover, as set forth above, in a section of the final briefing entitled "Appropriate Remedies," appellants asked that the Panel find in their favor and enjoin Wells Fargo from further misappropriation and, in the alternative, invited the Panel to "[d]ecline to exercise its jurisdiction to render a determination as to the ownership of the intellectual property in question." J.A. Ex. 000384. Thus, so long as the question of ownership and inventorship was left open, the appellants actively tried to sway the Panel in their favor. Though they suggested that the Panel might also decline jurisdiction, they did not contend that it should do so for other than prudential reasons and treated this as a secondary option.

Appellants counter that the question of "inventorship" for pending patent applications is reserved exclusively to the United States Patent and Trademark Office (USPTO) under federal law. See 35 U.S.C. § 135. Accordingly, appellants argue, even if the parties had agreed to arbitrate the issue of inventorship, the Panel lacked the power to resolve it. Moreover, appellants maintain that the Panel's decision conflicts with the conclusions of the USPTO in a subsequent interference proceeding in November 2008 in which the USPTO rejected a patent application from Wells Fargo.[7] Appellants assert that the USPTO's conclusions effectively invalidate the Panel's finding that Wells Fargo is the "inventor and owner" the DIXE software trade secrets at issue.

We find that appellants read too much into the phrase "inventor and owner" in ¶ 7(a) of the Award and ignore the specific context of the dispute over misappropriation that the Panel was charged with resolving. The Panel concluded that

---

[7]An interference proceeding is "an administrative proceeding in the U.S. Patent and Trademark Office to determine which applicant is entitled to the patent when two or more applicants claim the same invention. Such a proceeding occurs when the same invention is claimed (1) in two pending applications, or (2) in one pending application and a patent issued within a year of the pending application's filing date." Black's Law Dictionary, 818-19 (7th ed. 1999).

-17-

appellants had misappropriated trade secrets related to a technology that they claimed to have invented and developed. At bottom, appellants' dispute is with the Panel's conclusion, not with the extent of the Panel's authority. Throughout the proceedings, appellants urged the Panel to exercise that same authority to declare that they owned and invented the technology in dispute.

Mindful of the deference accorded to the arbitrators's decision, Crawford Group, Inc., 543 F.3d at 976, we will not second guess the Panel's determination that resolving the competing claims as to misappropriation made it necessary to consider who invented or developed the DIXE software. Appellants assumed as much by treating the question who invented or developed the software as a linchpin of the dispute over which party wrongfully misappropriated it. Accordingly, we conclude that the district court did not err when it declined to vacate the Award on the grounds that the Panel exceeded the scope of its arbitral mandate.

### C. Challenge to Award of Attorneys' Fees

Appellants contend that the district court erred in confirming the award of attorneys' fees against e-Pin, arguing that there was no basis to hold e-Pin liable for them. They point out that e-Pin is a party to the PLA, but not the SLA, and that the PLA provides that any dispute or agreement arising out of it "be resolved in accordance with the dispute resolution procedures specified in the [SLA]." J.A. Ex. 000274. Those procedures, in turn, endow the Panel with the authority to award costs and fees "to the same extent a judge could pursuant to the Federal Rules of Civil Procedure, or other applicable law." Id. ¶ 7. Appellants argue, however, that the Panel grounded its award of attorneys' fees on a different provision of the SLA, ¶ 12(k), which allows attorneys' fees to be awarded to the prevailing party. That provision is not incorporated by reference in the PLA and thus should not be applied against e-Pin, which was not a party to the SLA. Therefore, according to the

appellants, the Panel exceeded its authority in assessing fees against e-Pin in Wells Fargo's favor on the basis of the "prevailing party" provision.

Wells Fargo responds that the parties agreed that the arbitration would be governed by the AAA Rules, a provision of which expressly provides that "the award of the arbitrator(s) may include . . . an award of attorneys' fees if all parties have requested such an award or it is authorized by law or their arbitration agreement." AAA Rule 43(d)(ii). Wells Fargo submits that under this provision, if parties bound by the AAA Commercial Rules request attorneys' fees, then the arbitrators before whom they appear are empowered to award such fees.

As support, Wells Fargo cites affidavits from counsel for e-Pin, as well an affidavit from its sole owner, that were submitted to the Panel before it announced the Award. The affidavits requested that attorneys' fees be awarded to appellants. Wells Fargo had made a similar request before the Panel announced its decision. Accordingly, "all parties requested" an award of attorneys' fees and thus the Panel was authorized to consider those requests. Because Rule 43(d)(ii) provides a basis for the award of attorneys' fees against e-Pin, we conclude that the district court did not err in confirming it.

IV.

As recounted above, after the district court confirmed the Award, appellants moved to terminate or amend the permanent injunction pursuant to Rules 59(e) and 60(b)(5) of the Federal Rules of Civil Procedure. Rule 59(e) permits a motion to alter or amend a judgment no later than 28 days after it has been entered. Such motions "serve the limited function of correcting manifest errors of law or fact or to present newly discovered evidence." Lowry v. Watson Chapel Sch. Dist., 540 F.3d 752, 761 (8th Cir. 2008). Rule 60(b)(5) allows for relief from a final judgment on the grounds that "the judgment has been satisfied, released or discharged; it is based on an earlier

-19-

judgment that has been reversed or vacated; or applying it prospectively is no longer equitable[.]" Fed. R. Civ. P. 60(b)(5).

The district court indicated that it did not discern any error of fact or law, nor had the appellants presented evidence of changed circumstances that rendered the confirmation of the award inequitable or manifestly unjust. Consequently, it denied the motion to terminate or amend the permanent injunction. D. Ct. Order of Oct. 27, 2009, at 2. Appellants contend the district court abused its discretion in denying this post-trial motion. Wells Fargo contends that the appellants' motion does not satisfy the prerequisites for relief under either Rule 59(3) or Rule 60(b)(5), as reflected in the district court's findings denying their motion.

Appellants seek relief from the part of the Award that permanently enjoins them from "claiming as their own, asserting any ownership interest in, disclosing any part of, or using in any way the DIXE Trade Secrets of Wells Fargo Bank, N.A." J.A. 000054 ¶ 7(b). Appellants contend that the trade secrets to which this paragraph refers entered the public domain in January 2006 as a result of a patent application Wells Fargo filed. Thus, according to appellants, the permanent injunction bars them from using or disclosing information that is already in the public domain. By upholding it, they claim, the district court contravened the Minnesota State Secrets Act, which reads:

> Actual or threatened misappropriation may be enjoined. Upon application to the court, an injunction shall be terminated when the trade secret has ceased to exist, but the injunction may be continued for an additional reasonable period of time in order to eliminate commercial advantage that otherwise would be derived from the misappropriation.

Minn. Stat. § 325C.02. According to appellants, because the DIXE Software entered the public domain via Wells Fargo's patent application, it ceased to exist as a trade

secret and the district court abused its discretion in refusing to terminate the injunction.

Appellants locate their right to seek Rule 60(b)(5) relief in 9 U.S.C. § 13, which provides that a judgment confirming an arbitration award "shall have the same force and effect, in all respects, as, and be subject to all the provisions of law relating to, a judgment in an action; and it may be enforced as if it had been rendered in an action in the court in which it is entered." See AIG Baker Sterling Heights, LLC v. American Multi-Cinema, Inc., 579 F.3d 1268, 1273 (11th Cir. 2009) (concluding that a judgment confirming an arbitration award  is "to be treated no better or worse than any other civil judgment" and therefore is subject to Rule 60(b) relief). Appellants claim that enforcing the permanent injunction "is no longer equitable" under Rule 60(b)(5). But as the chronology they recite makes clear, to the extent that Wells Fargo brought the relevant DIXE software trade secrets into the public domain by filing for a patent application, it did so in January 2006, more than two and a half years before the Award was issued.

Because an injunction, "whether right or wrong, is not subject to impeachment in its application to the conditions that existed at its making," United States v. Swift & Co., 286 U.S. 106, 119 (1932), appellants must identify changed circumstances that shift the equitable balance in their favor under Rule 60(b)(5). They have failed to do so. Rather, appellants appear to invoke the rule to attack the merits of the Panel's conclusion, not because that conclusion is "no longer equitable" in light of changes in the law or underlying facts. This misconstrues the function of 60(b)(5) relief.

> The fact that the rule allows relief if it is "no longer equitable" for the judgment to have prospective application is not a substitute for an appeal. It does not allow relitigation of issues that have been resolved by the judgment. Instead it refers to some change in conditions that makes continued enforcement inequitable.

11 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2863, at 340 (2d ed. 1995). We conclude that the district court did not abuse its discretion in denying the motion to terminate or amend the permanent injunction.

## V.

The judgment is affirmed.

MURPHY, Circuit Judge, dissenting.

I dissent from the majority's answer to the question left open by the Supreme Court in Wachovia Bank v. Schmidt, 546 U.S. 303, 317 n.9 (2006). The Court's footnote 9 lends itself to two divergent interpretations of decisive importance in the case before this court. I respectfully suggest that the majority has followed the less supportable one. Based on the record and the well developed law in this area, I conclude that plaintiff Wells Fargo is not diverse to defendant Synoran since they are both citizens of the same state. While Wells Fargo's main office is located in South Dakota, its principal place of business is in California. There thus being no basis for diversity jurisdiction in this case, the judgment of the district court should be vacated and the case dismissed for lack of subject matter jurisdiction.

## I.

The starting point for analysis is 28 U.S.C. § 1348 which provides in relevant part: "All national banking associations shall, for the purposes of all other actions by or against them, be deemed citizens of the States in which they are respectively located." The focus of the case before our court is on the meaning of the word "located" for purposes of diversity jurisdiction. Section 1348 traces its roots to statutes enacted in 1882 and 1887 which created jurisdictional parity between state and national banks. Act of July 12, 1882, ch. 290, § 4, 22 Stat. 162, 163 (the

jurisdiction of national banks "shall be the same as, and not other than, the jurisdiction for suits by or against banks not organized under any law of the United States"); see Act of March 3, 1887, ch. 373, § 4, 24 Stat. 552, 554–55 (national banks shall be "deemed citizens of the States in which they are respectively located").

Though the language and codification of these statutes changed slightly over time, the Supreme Court has consistently interpreted them to have placed national banks "on the same footing as the banks of the state where they were located for all the purposes of the jurisdiction of the courts of the United States." Leather Mfrs.' Nat'l Bank v. Cooper, 120 U.S. 778, 780 (1887); see Continental Nat'l Bank v. Buford, 191 U.S. 119, 123–24 (1903); Petri v. Commercial Nat'l Bank, 142 U.S. 644, 650–51 (1892) ("no reason" why national banks "should not resort to federal tribunals as other corporations and individual citizens might").

The first judicial interpretation of the word "located" in the predecessor statutes to § 1348 was done by the Ninth Circuit in American Surety Company v. Bank of California, 133 F.2d 160, 162 (9th Cir. 1943). Reasoning that the citizenship of a corporation was "fixed by its principal place of business," the court held that national banks were citizens only of the "states in which their principal places of business were maintained." Id. Thus, at the time § 1348 was enacted in 1948: (1) the only Supreme Court decisions interpreting its predecessor statutes had ruled that a national bank's location should be considered on a comparable basis with state banks and corporations, and (2) the only circuit court decision had explained that a national banking association was located in the state of its principal place of business.

The current provision defining the citizenship of corporations, 28 U.S.C. § 1332(c)(1), was enacted in 1958. Although that statute did not reference the national banking association provision in § 1348, the Supreme Court explained again five years later  that the 1882 Act, a predecessor to § 1348, "sought to limit, with exceptions, the access of national banks to, and their suability in, the federal courts *to*

-23-

*the same extent to which non-national banks are so limited.*" <u>Mercantile Nat'l Bank v. Langdeau</u>, 371 U.S. 555, 565 (1963) (emphasis added). And fifteen years after the passage of § 1332(c)(1), our en banc court focused on the four prior judicial decisions which had recognized the congressional policy favoring jurisdictional parity for state and national banks. <u>See</u> <u>Burns v. Am. Nat'l Bank & Trust Co.</u>, 479 F.2d 26, 27–30 (8th Cir. 1973) (en banc). Neither the Supreme Court nor our court suggested in any way that the 1958 enactment of 28 U.S.C. § 1332(c)(1) had changed the longstanding and unanimous interpretations of § 1348 and its predecessors requiring jurisdictional parity between national and state banks.

The two leading appellate decisions addressing the exact issue before us—whether national banks are citizens of the state in which their principal place of business are located—are <u>Firstar Bank, N.A. v. Faul</u>, 253 F.3d 982, 985–94 (7th Cir. 2001), and <u>Horton v. Bank One, N.A.</u>, 387 F.3d 426, 429–36 (5th Cir. 2004), <u>cert. denied</u>, 546 U.S. 1149 (2006). Both circuit courts decided that the answer was yes after thorough analyses,[8] and both decisions were referenced positively in <u>Wachovia</u>. <u>See</u> 546 U.S. at 317 n.9. Thus, by 2004 three circuits had concluded that a national banking association is a citizen of the state of its principal place of business. <u>See</u> <u>Horton</u>, 387 F.3d at 436; <u>Firstar</u>, 253 F.3d at 994; <u>Am. Sur. Co.</u>, 133 F.2d at 162.

In <u>Wachovia</u>, the Supreme Court reaffirmed the reasoning in <u>Firstar</u> and <u>Horton</u> in the course of deciding that a national banking association is not a citizen of every state in which it maintains a branch office, but that it is at least a citizen of the state "in which its main office, as set forth in its articles of association, is located." 546 U.S. 303, 307 (2006). Specifically, the Court employed the principle of jurisdictional parity, the very principle which the majority concludes "no longer applies" and for which it finds "little support." The Court explained that "in comparison to the access

_____

[8] Both decisions also held that national banks were citizens of the state "listed in its organization certificate." <u>See</u> <u>Horton</u>, 387 F.3d at 436; <u>Firstar</u>, 253 F.3d at 994. <u>See also</u> <u>Wachovia</u>, 546 U.S. at 307.

-24-

afforded state banks and other state-incorporated entities," national banks' access to a federal forum would be "drastically reduced" if a national bank were deemed a citizen of every state where it maintained a branch. Id. at 307; see also id. at 317.

Most significantly, in Wachovia the Court alluded to, but did not decide, the precise issue now before our court. In its footnote 9, the Court wrote that "to achieve complete parity with state banks and other state-incorporated entities," a national banking association "would have to be deemed a citizen of both the State of its main office and the State of its principal place of business," and it cited Firstar and Horton favorably. Id. at 317 n.9. It acknowledged that § 1348 does not refer to a bank's "principal place of business," unlike § 1332(c)(1), but speculated that the "absence of a 'principal place of business' reference in § 1348 may be of scant practical significance for, in almost every case, as in this one, the location of a national bank's main office and of its principal place of business coincide." Id.

Subsequently a number of district courts have faced the question before us and disagreed about whether a national bank is a citizen of the state of its principal place of business. Judge John Koeltl took a new approach to the issue in Excelsior Funds, Inc. v. JP Morgan Chase Bank, N.A., 470 F. Supp. 2d 312 (S.D.N.Y. 2006). Relying heavily on the fact that Congress did not amend § 1348 in 1958 at the time it enacted § 1332(c)(1), he concluded that national banks are not citizens of the state of their principal place of business. Some subsequent district court decisions have followed his line of thinking, as has the majority here. Compare Tse v. Wells Fargo Bank, N.A., No. C10-4441 TEH, 2011 WL 175520, at *2 (N.D. Cal. Jan. 19, 2011), and DeLeon v. Wells Fargo Bank, N.A., 729 F. Supp. 2d 1119, 1123–24 (N.D. Cal. 2010), with Stewart v. Wachovia Mortgage Corp., No. CV 11-06108 MMM, 2011 WL 3323115, at *2–6 (C.D. Cal. Aug. 2, 2011), and Goodman v. Wells Fargo Bank, NA, No. CV 11-2685-JFW, 2011 WL 2372044, at *2 (C.D. Cal. June 1, 2011).

II.

I respectfully disagree with the majority's framing of the issue to be whether the principle of jurisdictional parity "remained intact" after the adoption of § 1332(c)(1) in 1958. I submit that the issue is more properly viewed to be whether Wachovia undermines the longstanding and unanimous circuit precedent holding that national banks are citizens of their principal places of business. In my view, Wachovia should be construed in favor of continuing to read § 1348 in light of the preexisting policy of jurisdictional parity between national banks on the one hand and state banks and corporations on the other. Accordingly, I would hold that national banks are citizens of the state where their principal place of business is located in addition to the state in which their main office is located.

In Wachovia the Supreme Court actually applied the principle of jurisdictional parity to reverse a circuit court decision that had not complied with it. The Fourth Circuit's conclusion that national banks were citizens of every state in which they maintained a branch office was erroneous because, "in comparison to the access afforded state banks and other state-incorporated entities," national bank access to a federal forum would be "drastically reduced." Wachovia, 546 U.S. at 307; see also id. at 317 ("By contrast, the Court of Appeals' decision in the instant case severely constricts national banks' access to diversity jurisdiction as compared to the access available to corporations generally."). If the majority were correct that the principle of jurisdictional parity in § 1348 was abrogated with the passage of § 1332(c)(1) in 1958, the Supreme Court would not have relied on that principle to decide Wachovia.

The Court suggested in footnote 9 in Wachovia that jurisdictional parity remains a salient principle. That is the closest it has come to deciding the issue now before us. The Court noted that to "achieve complete parity with state banks and other state-incorporated entities," a national bank "*would have to be deemed a citizen of both the State of its main office and the State of its principal place of business.*" Id.

at 317 n.9 (emphasis added). Having just relied on that principle to decide the case before it, the Court appeared to hint that in order to achieve "complete parity," a national bank would be a citizen of the state of its principal place of business. And the two circuit cases it cited favorably, Firstar[9] and Horton, reached that conclusion.

In view of the Court's reliance on the principle of jurisdictional parity to decide Wachovia, footnote 9 is most fairly read to suggest that, in the rare case where a bank's main office and principal place of business are in different states, the national bank would be "located" in both. To reach that conclusion would achieve "complete parity," a principle that the Supreme Court linked to § 1348 and its predecessors. That would explain the Court's citations to Firstar and Horton and its emphasis that corporations are citizens of their state of incorporation "*and*" the state of their principal place of business (emphasis in original). Wachovia, 546 U.S. at 317 n.9.

The majority also overlooks a significant portion of the exchange between individual Justices and the attorney representing the Comptroller of the Currency during the arguments in Wachovia. Counsel argued that a national banking association is not a citizen of each state in which it has a branch, a position subsequently taken by the Court. In the course of his comments he also remarked that a national bank is not a citizen of the state of its principal place of business. See slip op. at 13; 2005 WL 3358081, at *20–21. Several Justices appeared skeptical of reading the jurisdictional statutes to limit a national bank to being a citizen of only one state. Counsel faced vigorous questioning from members of the Court on that position and twice admitted that its position was not "open and shut":

---

[9] The majority suggests that Hicklin Eng'g, L.C. v. Bartell, 439 F.3d 346, 348 (7th Cir. 2006) may have overruled Firstar. Hicklin does no such thing; it does not even mention Firstar. Although it contains dicta referencing Wachovia, Judge Flaum, the author of Firstar, was on the panel and would surely have addressed any contrary holding.

-27-

JUSTICE STEVENS: Is it your view that a national bank may have two parallel locations or just one?

MR. SRINIVASAN: It–it could have a main office that's different from what one would construe to be its principal place of business under the test that applies to corporations under 1332(c)[.]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

MR. SRINIVASAN: Our view is that it wouldn't be a citizen of a State simply by virtue of the fact that it has its principal place of business there. Now, I would say, though, that it's not an open and shut case because the Court in a case that specifically raised the issue . . . could construe 1332(c) . . . as also applying to national banking associations[.]

JUSTICE SCALIA: And if we did–if we did interpret 1332(c) that way, there wouldn't be any favoritism for national banks.

MR. SRINIVASAN: That's right. It would entirely eliminate favoritism.

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

JUSTICE GINSBURG: But you did say 1332(c) does not apply to the national bank. It's only one location.

Mr. SRINIVASAN: That–that's our view, but again, I'm–I wouldn't characterize it as an–as an open and shut case[.]

2005 WL 3358081, at *29–32.

Chief Justice Roberts and Justice Scalia both appeared concerned that limiting a national bank's citizenship to its main office would put national banks in a "favored" position. 2005 WL 3358081, at *8–9, 30. Justice Stevens questioned the logic of a rule that would allow a national bank to choose its main office in a small state removed from where it does a majority of its business. See id. at *24–26. And counsel for Wachovia Bank even conceded that § 1348 could be interpreted "to include

-28-

principal place of business." Id. at *8. Significantly, all Justices concurred in footnote 9's acknowledgment that to achieve "complete parity" a national banking association "would have to be deemed a citizen of both the State of its main office and the State of its principal place of business." Wachovia, 546 U.S. at 317 n.9.

This position is also consistent with what appear to be the only widely available written positions taken by the Comptroller of the Currency on the issue now before us, see Office of the Comptroller of the Currency, Interp. Ltr. No. 952, at 6 (Oct. 23, 2002), as well as the Comptroller's amicus brief in Horton. See 2003 WL 25953465, at *3–14. That brief remains accessible on the government's website today. See www.occ.gov/topics/laws-regulations/litigation/leg-proc-other-horton-vs-bank-one.pdf, at 14 (last accessed Aug. 26, 2011) ("Thus, for diversity purposes a national bank should be deemed a 'citizen' of the state of its principal place of business and (if different), the state specified in the bank's articles of association.").

I also respectfully suggest that the majority has overlooked relevant circuit precedent. In Burns, the en banc court recounted § 1348's history as embodying the principle of jurisdictional parity. See 479 F.2d at 28–29. Burns was decided in 1973, after the 1958 enactment of § 1332(c)(1), but the majority does not cite it and instead concludes that jurisdictional parity "no longer applies" because Congress did not choose to "retain" the concept in 1958. That conclusion is inconsistent with Burns's recitation of the history of § 1348.

When § 1348 was enacted in 1948, the only appellate court to have expressly considered the issue now before us had held that a national banking association is "located" in, and therefore a citizen of, the state of its principal place of business. See Am. Sur. Co., 133 F.2d at 162. Congress is presumed to have intended that principle to carry over to § 1348. See Bragdon v. Abbott, 524 U.S. 624, 645 (1998); Lorillard v. Pons, 434 U.S. 575, 580–81 (1978), and cases cited; Firstar, 253 F.3d at 988. The majority concludes that the "most relevant time period for determining a statutory

term's meaning is the time when the statute was enacted." Slip op. at 9. Yet it does not cite <u>American Surety</u> and even implies that principal place of business citizenship "was unknown at the time of its adoption." Slip op. at 11. This is simply inaccurate, since principal place of business citizenship was a creature of the common law, and had been applied in <u>American Surety</u> to § 1348's predecessor statute.

No doubt Congress could have also made § 1348 clearer in 1958 when it enacted § 1332(c)(1), but it need not have done so given the preexisting understanding of the statute and its predecessors which placed national and state banks on equal jurisdictional footing. Had Congress intended to abrogate the principle of jurisdictional parity in 1958, it would have been a "noteworthy departure" from established jurisdictional principles, and it "more likely than not [] would have plainly stated such intent" if that had been its preferred outcome. <u>Am. Sur. Co.</u>, 133 F.2d at 162.

### III.

Since I conclude that Wells Fargo is a citizen both of South Dakota and of California, its principal place of business, I would hold that it and Synoran are nondiverse parties. The case should therefore be dismissed for lack of subject matter jurisdiction.

_____

-30-